Richard J. Angell, Nevada Bar ID No. 9339
Ashley C. Nikkel, Nevada Bar ID No. 12838
PARSONS BEHLE & LATIMER
50 West Liberty Street, Suite 750
Reno, NV 89501
Telephone:  775.323.1601
Facsimile:  775.348.7250
rangell@parsonsbehle.com
anikkel@parsonsbehle.com

*Attorneys for Sunset Commercial LLC*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SUNSET COMMERCIAL LLC, a Nevada Limited Liability Company,<br><br>                    Plaintiff,<br><br>          vs.<br><br>STAUFFER MANAGEMENT COMPANY, a Delaware Limited Liability Company; MONTROSE CHEMICAL CORPORATION OF CALIFORNIA, a Delaware Corporation; ATLANTIC RICHFIELD COMPANY, a Delaware Corporation; OLIN CORPORATION, a Virginia Corporation, TITANIUM METALS CORPORATION, a Delaware Corporation; NL INDUSTRIES, INC., a New Jersey Corporation; LE PETOMANE XXVII, INC., an Illinois Corporation, in its representative capacity as the NEVADA ENVIRONMENTAL RESPONSE TRUST TRUSTEE; and the UNITED STATES OF AMERICA.<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMAND |

Plaintiff, SUNSET COMMERCIAL LLC ("Sunset"), for its cause of action against Defendants, and each of them individually, states and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over this case pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") Sections

PARSONS
BEHLE &
LATIMER

1

4870-0207-8355

107(a) and 113(g)(2) (creating exclusive original jurisdiction over CERCLA matters),[1] 22 U.S.C. § 1331 (setting forth federal question jurisdiction), and the Declaratory Judgment Act 28 U.S.C. § 2201.

2.      This Court has jurisdiction over the Nevada state law claims asserted herein pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in the Southern District of Nevada pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in Clark County, Nevada, and the City of Henderson, Nevada.  Venue is also proper in this judicial district pursuant to 42 U.S.C. § 9613(b) because the release of hazardous substances and resulting damages occurred in Clark County, Nevada, and the City of Henderson, Nevada.

4.      The United States has waived sovereign immunity pursuant to 42 U.S.C. § 9620(a)(1) with respect to claims against the United States.

## NATURE OF ACTION

5.      Sunset owns a 32.63-acre parcel located at 347 West Sunset Road, Henderson, Nevada (the "Sunset Site").

6.      The Sunset Site is adjacent to an industrial area known as the Black Mountain Industrial Complex ("BMI Complex").  A figure detailing the location of the Sunset Site and the BMI Complex is attached hereto as Attachment 1.

7.      The BMI Complex has been used for industrial purposes since the World War II ("WWII") era.

8.      Various historical industrial operations of the above-named Defendants within the BMI Complex discharged hazardous substances that were transported through ditches for handling and disposal.  A figure depicting the various ditches of the BMI Complex is attached hereto as Attachment 2.

9.      Two of these ditches, known as the Western Ditch and Northwest Ditch, originated from industrial operations on southern portions of the BMI Complex and conveyed industrial

---

[1] Codified at 42 U.S.C. §§ 9607(a) and 9613(b).

PARSONS
BEHLE &
LATIMER

4870-0207-8355

discharges of hazardous substances in a northerly direction downgradient across the Sunset Site on the way to an area of the BMI Complex known as the Lower Ponds for management and disposal. A conceptual diagram illustrating the roles the Western and Northwest Ditch played in conveying discharges of hazardous substances from industrial operations to the disposal locations is attached hereto as Attachment 3.

10.     Discharges of hazardous substances into the Western Ditch and the Northwest Ditch by each of the above-named Defendants, as set forth in more detail herein, have resulted in the contamination of the Sunset Site.

11.     Many of the impacts from historical disposal of hazardous substances related to the BMI Complex, including those portions of the Western Ditch and the Northwestern Ditch within the BMI Complex, have been, or are in the process of being, addressed under the oversight of the Nevada Department of Environmental Protection ("NDEP").

12.     Although portions of the Western Ditch and Northwestern Ditch on the BMI Complex both upgradient and downgradient of the Sunset Site have been, or are in the process of being, addressed under NDEP oversight, the Sunset Site was never investigated or addressed by any of the above-named Defendants.

13.     Plaintiff Sunset is cleaning up the Sunset Site under NDEP oversight to address hazardous substances related to discharges to the Western Ditch and Northwestern Ditch by the above-named Defendants.

14.     Each of the named Defendants have been held liable and/or admitted liability for costs associated with cleanup at the BMI Complex or agreed to investigate and cleanup the portions of the BMI Complex, which includes both the upper and lower portions of the Western Ditch and Northwestern Ditch on either side of the Sunset Site leaving a gap in characterization and cleanup of the Western Ditch and Northwestern Ditch.

15.     This action closes that gap by addressing contamination on the Sunset Site that heretofore has not been part of the Defendants' cleanup efforts.

16.     Plaintiff Sunset brings this action against the Defendants for response cost recovery and declaratory judgment under the federal Comprehensive Environmental Response,

PARSONS
BEHLE &
LATIMER

4870-0207-8355

Compensation, and Liability Act ("CERCLA").

17.    In addition to Sunset's CERCLA claims, it brings claims for the creation of an unlawful nuisance, trespass, strict liability, negligence.

18.    As a result of the Defendants' acts or omissions, Sunset has incurred damages, including diminished property value and costs associated with ongoing and future response actions at the Site.

## PARTIES

19.    Plaintiff Sunset is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business located in Las Vegas, Nevada.  It is in the business of developing property for commercial and industrial use.   In furtherance of its business, in 2013 Sunset purchased the "Sunset Site."

20.    Defendant ATLANTIC RICHFIELD COMPANY ("Atlantic Richfield") is a Delaware Corporation with its principle place of business in Houston, Texas.

21.    Atlantic Richfield is the successor-in-interest to the Anaconda Mining Company ("Anaconda") and/or Anaconda's liabilities with respect to the above-captioned action.

22.    Anaconda was an operator of the BMI Complex during a period when it operated disposal sites and disposed of hazardous substances that, on information and belief and as alleged in more detail herein, resulted in contamination at the downgradient Sunset Site.

23.    On information and belief, in or about May 1955, the Anaconda Copper Mining Company changed its name to The Anaconda Company.

24.    On information and belief, on or about January 12, 1977, The Anaconda Company merged with and/or became a wholly-owned subsidiary of Atlantic Richfield.

25.    By virtue of the merger and subsequent corporate transactions, Atlantic Richfield has succeeded to Anaconda and/or its liabilities with respect to the above-captioned action.

26.    Defendant STAUFFER MANAGEMENT COMPANY, LLC ("Stauffer") is a Delaware Limited Liability Company with its principal place of business located in Wilmington, Delaware.  Stauffer is the successor-in-interest to Stauffer Chemical Company.

27.    Stauffer was an owner and an operator of a portion of the BMI Complex during a

period when it operated disposal sites and disposed of hazardous substances that, on information and belief and as alleged in more detail herein, resulted in contamination at the downgradient Sunset Site.

28. Defendant MONTROSE CHEMICAL CORPORATION OF CALIFORNIA ("Montrose") is a Delaware Corporation with its principal place of business located in Los Angeles, California.

29. Montrose was a lessee and an operator of a portion of the BMI Complex during a period when it operated disposal sites and disposed of hazardous substances that, on information and belief and as alleged in more detail herein, resulted in contamination at the downgradient Sunset Site.

30. Defendant OLIN CORPORATION ("Olin") is a Virginia Corporation with its principal place of business located in Clayton, Missouri.

31. Olin is the successor-in-interest to Pioneer Chlor Alkali, Inc. ("Pioneer") and/or Pioneer's liabilities with respect to the above-captioned action.

32. Pioneer was an owner and an operator of a portion of the BMI Complex during a period when it operated disposal sites and disposed of hazardous substances that, on information and belief and as alleged in more detail herein, resulted in contamination at the downgradient Sunset Site.

33. Defendant LE PETOMANE XXVII, INC., is an Illinois corporation serving as the NEVADA ENVIRONMENTAL RESPONSE TRUST ("NERT") Trustee.

34. NERT is the successor-in-interest to Tronox and/or Tronox's liabilities with respect to the above-captioned action.

35. Defendant Titanium Metals Corporation ("Timet") is a Delaware Corporation with its principle place of business in Warrensville Heights, Ohio.

36. Timet was an owner and an operator of a portion of the BMI Complex during a period when it operated disposal sites and disposed of hazardous substances that, on information and belief and as alleged in more detail herein, resulted in contamination at the downgradient Sunset Site.

37.     Defendant NL INDUSTRIES, INC. ("NL Industries"), is a New Jersey Corporation with its principle place of business in Dallas, Texas.

38.     NL Industries and Allegheny Ludlum Steel Corporation formed Timet as a joint venture in 1950.

39.     NL Industries was a lessee and an operator of a portion of the BMI Complex during a period when Timet operated disposal sites and disposed of hazardous substances that, on information and belief and as alleged in more detail herein, resulted in contamination at the downgradient Sunset Site.

40.     Defendant UNITED STATES OF AMERICA ("United States") through the Defense Plant Corporation ("DPC"), Reconstruction Finance Corporation ("RFC"), War Production Board, Department of Defense (including, but not limited to, the United States Navy), Department of Treasury, Department of Commerce, and/or agents, including government contractors, owned and/or operated the BMI Complex during a portion of the period when hazardous substances were disposed of and released at the Site.

41.     The United States generated and arranged for disposal of hazardous substances at the BMI Complex.

42.     On information and belief and as alleged in more detail herein, the United States' disposal activities at the BMI Complex resulted in contamination at the downgradient Sunset Site.

## GENERAL ALLEGATIONS

I.     **Early History of the BMI Complex: 1941-1948.**

43.     The BMI Complex and other areas surrounding or near the Sunset Site have been used for a variety of industrial and manufacturing purposes dating back to the World War II era. A map showing the Sunset Site and the BMI Complex is attached hereto as Attachment 1.

44.     In 1941, the United States deeded approximately 5,000 acres of then-unoccupied desert southeast of Las Vegas for purposes of constructing the world's largest magnesium plant to meet military demands for World War II. The plant is referred to herein as the "Basic Magnesium Plant" and occupied only a portion of the BMI Complex.

45.     The construction of the Basic Magnesium Plant was part of the United States'

industrial expansion leading up to and during World War II ("WWII").  Magnesium was a critical component in aircraft production and, by 1940, worldwide demand was exceeding supply.  To ensure that magnesium was available for defense purposes, the United States military embarked on an effort to organize and fund the construction of a magnesium plant.  As part of this effort, in 1941 the United States military entered into discussions with Howard Ellis, a WWII era industrialist and President of Basic Refractories, Inc ("BRI").  These negotiations ultimately led to the formation of Basic Magnesium, Inc. ("Basic Magnesium"), the entity that was charged with overseeing the construction and operation of the magnesium plant.

46.     On or about September 3, 1941, Basic Magnesium and the Defense Plant Corporation ("DPC")—the military agency overseeing Basic's work on the magnesium plant—entered into a construction contract with McNeil Construction Company for the construction of the Basic Magnesium Plant.  The United States, via the DPC and other government agencies, dictated the cost and provided the funds necessary to build the Basic Magnesium Plant.

47.     DPC designated a government officer to approve and dictate the plans, designs, specifications and schedules for the construction and equipment of the magnesium plant; approve the acquisition and installation of buildings, machinery and equipment for the plant; the costs of such buildings, machinery and equipment; any alterations to such plans, designs, specifications, schedules, and purchases of buildings, machinery and equipment; and bills of vendors of the buildings, equipment and machinery.

48.     Ground breaking and construction of the BMI Complex began on or about September 15, 1941, on undeveloped desert land owned by the United States, which later came to be known as the BMI Complex.

49.     On or about August 15, 1942, the Basic Magnesium Plant went into production, meeting its full production capacity in July 1943.  Basic Refractories Inc. was a majority shareholder of Basic Magnesium Inc.  Basic Magnesium Inc. was the initial operator of the Basic Magnesium Plant, doing so pursuant to an agreement with the United States government, including the DPC.

50.     On information and belief, the DPC owned the work in process at the Basic

Magnesium Plant, the finished goods and the by-products and process wastes.  The United States set the plant's production rate and held first priority to take and use the plant's output.  On information and belief, the United States used the vast majority, if not all, of the magnesium produced by the Basic Magnesium Plant.

51.     By early 1942 DPC had become dissatisfied with Basic Magnesium's progress.  The DCP approached the Anaconda about taking over operations at the plant.  At the DCP's request, Anaconda thereafter entered into negotiations with Basic Magnesium and, pursuant to a September 30, 1942 agreement, took a controlling interest in Basic Magnesium.

52.     In or about April 1944, the United States ordered a reduction in the level of production at the Plant.  On or about September 6, 1944, the United States ordered cessation of magnesium production at the Basic Magnesium Plant, and actual production of magnesium ceased on or about November 15, 1944.  However, the chlorine plant and caustic soda plant remained in production until May 1945 at the United States' request.

53.     In total, Basic Magnesium operated the plant from August 31, 1942 to November 15, 1944.  The plant produced 166,322,685 pounds of marketable refined or alloyed magnesium ingots, billets, or slabs.

54.     In November 1944, the Reconstruction Finance Corporation ("RFC"), another federal government agency, assumed control of the Plant, including the real property, equipment and machinery, and work in process and inventory.  In May 1945, the RFC replaced Anaconda with J.M. Montgomery & Co., Inc., who, as an agent for RFC, managed the property.

55.     In or about May 1945, the United States Navy entered into a contract with a private contractor to produce ammonium perchlorate in Electrolysis Unit 4 of the plant.  Pursuant to the contract, the government contractor began operating at the site on or about June 15, 1945.

56.     On or about May 1, 1945, Stauffer leased a portion of the property within the BMI Complex from the DPC, and later the RFC, and began manufacturing chlorine and caustic soda at the old magnesium plant, *i.e.*, the BMI Complex.

57.     In or about June 1945, the United States subleased property to a government contractor who had entered into a contract with the U.S. Navy at about the same time to produce

perchlorates at the BMI Complex.  The contractor first produced perchlorates from about June 15, 1945 to August 16, 1945.

58.	On or around June 30, 1945, the United States Congress transferred all of DPC's responsibilities for the BMI Complex to the RFC.

59.	In or about February 1946, the government contractor, who had produced perchlorates pursuant to its agreement with the U.S. Navy in 1945, negotiated a lease with the RFC and re-started its production of perchlorates.

60.	In October 1946, RFC transferred custody of the BMI Complex to the War Assets Administration (hereinafter "WAA"), also a United States government agency.  WAA was given the task of disposing of surplus property, including real estate and equipment inventory at the BMI Complex.

61.	Between approximately October 1947 and March 1948, the WAA and RFC proposed to and negotiated with the State of Nevada, acting by and through the Colorado River Commission of Nevada (hereinafter "CRC" or "State"), regarding purchase of the BMI Complex property.

## II.	Expansion and Development of the BMI Complex: Post WWII

62.	On or about April 1, 1948, CRC took possession of the BMI Complex.  On or about June 3, 1949, the United States, acting through the War Assets Administration and Reconstruction Finance Corporation, transferred the property to the State via quitclaim deed.  CRC was assigned the United States' lease with Stauffer.

63.	The State owned the BMI Complex property and leased it to various industrial manufacturing entities from approximately July 1949 until the State sold the property in June 1952.

64.	Lessors of the property during the United States' and State of Nevada's ownership included Stauffer.

65.	In or about March 1952, Stauffer purchased a portion of the BMI Complex property from the State and began manufacturing pesticides and organic chemical products.  Stauffer continued operating at the BMI Complex until transferring ownership of its interests in the BMI Complex to Pioneer Chlor Alkali, Inc. ("Pioneer"), in 1988.

PARSONS
BEHLE &
LATIMER

4870-0207-8355

66. Pioneer continued operations as the BMI Complex until it was acquired by Olin Corporation in 2007.

67. In 1952, Stauffer subleased property to a government contractor that produced perchlorates for the United States military and its contractors. Ammonium perchlorate production continued after 1953 in a plant owned by the Navy and built on land purchased by the Navy. Ammonium perchlorate production, and production of sodium chlorate and sodium perchlorate as feedstocks, continued under the Navy's supervision until approximately 1962, when the United States sold its plant and equipment to the government contractor.

68. Beginning in June 1952, the five principal operating companies (and tenants) within the BMI Complex purchased from the State, via separate conveyances, the properties and facilities on those properties which they had been operating during their lease with the CRC.

69. At or about the same time in 1952, the CRC sold the remainder of the BMI Complex property to Basic Management, Inc. ("Basic Management"), which had been formed in December 1951 by a group of the same five principal operating companies for the purpose of acquiring and managing certain common assets at the BMI Complex.

70. Basic Management was responsible for managing the properties, utilities, and facilities that were common to all users of the BMI Complex ("Common Areas").

71. In or about October and November 1953, the CRC and the U.S. Navy's government contractor, respectively, deeded certain parcels of the BMI Complex to the United States Navy.

72. During the period of 1953 to 1962, the government contractor, under direction of the U.S. Navy, facilitated the manufacture of perchlorates on the government-owned property. The U.S. property included the entire ammonium perchlorate plant and the underlying land, and equipment used to manufacture sodium chlorate and sodium perchlorate, including approximately 400 electrolytic cells.

73. On information and belief, the production of the sodium perchlorate plant was dedicated to United States government purposes. On information and belief, at the ammonium perchlorate plant, Naval personnel worked on site supervising the contractor's production.

74. On information and belief, throughout the period during which the Navy owned the

perchlorate plants, the plant's process effluent was disposed of via the unlined ditches to ponds in the Common Areas.  The process effluent contained, among other things, perchlorate compounds and chromium compounds.

75.     On information and belief, on or about March 15, 1962, the U.S. Navy issued a quitclaim deed to the government contractor with respect to the ammonium perchlorate plant.

76.     In 1947, Montrose subleased from Staffer approximately 10 acres of BMI property on which Montrose built an organic chemical manufacturing plant.  Between 1947 and 1983, Montrose produced a variety of organic chemicals at its manufacturing plant.

77.     TIMET was formed by a joint venture agreement between Allegheny Ludlum Steel Corporation and National Lead Company in 1950.  National Lead initially leased facilities at the site from the CRC, which assigned the leases to the GSA after the CRC sold most of the Basic Magnesium property.  TIMET ultimately obtained title to the leased property in the BMI Complex.

78.     National Lead Company changed its name to NL Industries, Inc., on April 15, 1971.

79.     Western Electro Chemical Company ("WECCO") was formed in 1941, and leased a portion of the BMI Complex, and by August 1952, WECCO had purchased several other portions of the BMI Complex for its various production lines.

80.     American Potash and Chemical Company merged with WECCO in 1955.  Kerr-McGee purchased American Potash and Chemical Company in 1967.  In 2005, Kerr-McGee became Tronox LLC.

81.     In 2009, Tronox LLC filed for bankruptcy.  As a result, the Nevada Environmental Response Trust ("NERT") was established in February 2011 and became the owner of the property that was previously owned by Tronox while it performs its purpose to address this historical legacy contamination.

82.     By 1976, the entities operating at the BMI Complex discontinued their practice of disposing waste in the unlined ditches and ponds to the Common Areas.

### III.     Waste Management at the BMI Complex.

83.     The manufacturing of magnesium at the BMI Complex required two major raw materials, magnesite and chlorine.  The magnesium plant had two major components corresponding

to each of these raw materials, a chlorine/caustic plant and a magnesium production plant.

84. During the magnesium production process, a mixture of calcined magnesite, coal, and peat was heated in electric furnaces (chlorinators) in an atmosphere of chlorine gas. Anhydrous magnesium chloride formed in the chlorinators was transferred to electrolytic cells where molten magnesium was separated from the chlorine. Magnesium was collected, refined, and cast into bars or other products.

85. Waste products generated during the magnesium production process included, but were not limited to, acid and caustic process liquors containing hydrochloric acid, residual salts comprised of sodium hydroxide and sodium chloride, asbestos sludge, dioxins, furans, hexachlorobenzene, arsenic, and solid residues such as refinery slag cakes.

86. After magnesium production ceased, tenants and contractors of the United States, and later tenants of the State of Nevada, engaged in a variety of manufacturing activities at the BMI Complex, including the production of chlorine, caustic soda, boron compounds, ammonium perchlorate, sodium perchlorate, pesticides, and other organic chemicals.

87. Throughout the tenure of the United States, Anaconda, and the State of Nevada, at least four principal areas within the Common Areas were used for waste disposal: the Trade Effluent Disposal Ponds, the Upper and Lower Ponds, the ditch drainage system leading to the Upper and Lower Ponds, and the BMI Landfill.

88. In the early 1940s, when the Basic Magnesium Plant was being constructed, the United States also built a ditch drainage system. The ditch draining system was designed to carry industrial effluents and storm runoff from the Basic Magnesium Plant site. Components of the ditch drainage system consisted of the Alpha Ditch, the Beta Ditch, the Western Ditch (sometimes known as the Stauffer Effluent Ditch), the Northwest Ditch, and the Western Trench System.

89. The ditch draining system, including the Western Ditch and Northwest Ditch, were open surface drainage channels. They channeled industrial waste into the Upper and Lower Ponds. The entire system, inclusive of the ditches and ponds, drained into the Las Vegas Wash. Attachment 2 is a diagram showing the historic drainage flows at from the BMI Complex, including the flow through the Western and Northwestern Ditches.

PARSONS
BEHLE &
LATIMER

4870-0207-8355

90.     The Western Ditch, historically also referred to as the Stauffer Effluent Ditch, conveyed wastewater and storm water from the chlorine and caustic soda production facilities of the Basic Magnesium Plant (later purchased by Stauffer and Pioneer, as set forth below).  The Northwestern Ditch conveyed a combination of effluent from facilities other than the chlorine and caustic plants.

91.     The ditches were used first by the United States and Anaconda and/or their lessees when the Basic Magnesium Plant was built and operated.  Thereafter industrial actors at the BMI Complex discharged waste into the ditch draining system, including but not limited to the Western and Northwest Ditches, until approximately 1976.

IV.     **Waste-Related Activities Involving Each Named Defendants.**

A.     **Atlantic Richfield and the United States.**

92.     As set forth above, Anaconda took a controlling interest in Basic in September 30, 1942 and, through Basic, operated the Basic Magnesium Plant until its closure on November 15, 1944.

93.     Anaconda, as the controlling member of Basic, generated and arranged for the disposal of hazardous substances at the BMI Complex.

94.     During the years it operated the Basic Magnesium Plant through Basic, Anaconda oversaw and arranged for the operation of a chlorine/caustic manufacturing plant to manufacture key ingredients needed to produce magnesium.  The chlorine/caustic plant used a process known as the Hooker cell process to manufacture sodium hydroxide and chlorine by electrolysis of sodium chloride.

95.     The Hooker cell process generated a large volume of asbestos waste.  Asbestos waste was generated through a high-pressure water stream used to remove the asbestos.

96.     In addition to asbestos, the Basic Magnesium Plant that was owned by the United States and operated by Atlantic Richfield discharged other hazardous substances such as arsenic, dioxins, furans, and hexachlorobenzene.

97.     These waste streams were conveyed via the BMI Complex ditch system, including the Western and Northwestern Ditch that flowed across the Sunset Site.

98.     In *Basic Management Inc. v. United States*, this Court held the United States is liable under CERCLA § 107 (a)(3) as an arranger for disposal of hazardous substances at the BMI Complex, including discharges into the Western and Northwestern Ditch that flowed across the Sunset Site.  *See Basic Management v. United States*, 569 F. Supp. 2d 1106, 1119 (D. Nev. 2008) (holding the United States liable as an arranger).   The United States also admitted in *Basic Management v. United States* that it is liable under CERCLA § 107(a)(1) as an owner of the BMI Complex.  *See id*. at 118 (acknowledging the United State's admission of owner liability during WWII).

99.     In *Basic Management v. United States*, this Court held that Atlantic Richfield's predecessor, Anaconda, was liable under CERCLA 107(a)(1) and (a)(3) as an operator and an arranger for disposal of hazardous substances at the BMI Complex, including discharges into the Western and Northwestern Ditch that flowed across the Sunset Site.  *See Basic Management v. United States*, 569 F. Supp. 2d 1106, 1116 (D. Nev. 2008) (holding that Atlantic Richfield's predecessor, Anaconda, was liable as an operator); *see also id*. at 1117 (holding Anaconda liable as an arranger).  In that prior litigation, Atlantic Richfield did not dispute that it was responsible for Anaconda's contamination of the BMI Complex.  *See id.* at 1114 ("Atlantic Richfield . . . does not contest successor liability if Anaconda was an operator or arranger).

**B.     Stauffer.**

100.     Stauffer was one of the first occupants of the BMI Complex after the cessation of magnesium production.  Stauffer leased the chlorine and caustic plant in 1945 and, starting in 1951, made the first in a series of purchases of land and facilities at the BMI Complex.  Stauffer ultimately owned over 400 acres of property at the BMI Complex and, among other facilities, the chlorine and caustic plant ("Stauffer Site").

101.     From 1945 to 1975 Stauffer manufactured a variety of chemicals at the Stauffer Site, including (at various times) chlorine, caustic soda, lindane, Trithion, methlytrithion, p-chlorobenzenethiophenol, and O, O-diethylphosphorodithioic acid (DTA).

102.     Stauffer's manufacturing produced numerous waste streams that were conveyed to the BMI Ponds via the BMI Complex's drainage ditch system, including the Western and

Northwestern Ditch.

103.    The following table summarizes discharges into the BMI Complex ditch system between 1945 and 1975.

| Process Operation | Dates Operation Occurred (Years) | Volume of Waste (Tons) | TDS Concentration in Waste (Percent) | Volume of Waste (Tons) | Distribution of Wastes | |
|---|---|---|---|---|---|---|
| | | | | | Upper Ponds (Jan. 1971-Dec. 1975) | Lower Ponds (May 1945-Dec. 1970) |
| Thiophenol/p-chlorothiophenol | 1/60-12/75 | | | | | |
| Phosphoric acid waste | | 19,636 | ~100% | 19,636 | 6,136 | 13,500 |
| Aqueous process waste | | 1,206,400 | 3% | 36,192 | 11,310 | 24,882 |
| Caustic wastewater | | No data | | | - | - |
| Trithion/Imidan | 1/58-12/75 | | | | - | - |
| Aqueous waste | 1/58-12/74 | 29,992 | 10% | 2,999 | 706 | 2,293 |
| Dithio acid salt | 1/58-12/75 | 2,259,000 lbs produced from 12/77-6/78 | 27.35% | 9,532 | 2,648 | 6,884 |
| | | | | | - | - |
| Chlor-alkali | 1/46-12/75 | | | | - | - |
| Brine sludge | | 96,857 | 25.10% | 24,311 | 4,052 | 20,259 |
| Hypochlorite waste | | 20,750 | 11.58% | 2,401 | 400 | 2,001 |
| Sulfate slurry | | 1,313,542 | 7% | 91,948 | 15,325 | 76,623 |
| Fume scrubber | | 45,661 | 0.10% | 46 | 8 | 38 |
| **Total** | | | | **187,065** | **40,584** | **146,481** |

104.    In the early 1990s, Stauffer and Pioneer jointly commissioned a Phase I Environmental Conditions Assessment Report ("Stauffer/Pioneer ECA") in accordance with a consent agreement reached with the Nevada Division of Environmental Protection.    The Stauffer/Pioneer ECA, the final version of which was dated March 22, 1993, refers to the Western Ditch as the "Stauffer Effluent Ditch" and states that Stauffer conveyed waste to the Lower BMI Ponds through that ditch, among other ditches.

105.    The March 22, 1993 Stauffer/Pioneer ECA also acknowledges that Stauffer disposed of asbestos into the BMI ponds via the Western Ditch and other ditches, describing asbestos as a "primary" waste material: "The primary waste materials conveyed to the ponds

included asbestos and industrial effluent."

106.    Stauffer's chlor-alkali plant generated large volumes of asbestos waste.  Until 1976, Stauffer reconditioned cells using a process known as the Hooker cell process.  The Hooker cell process relied a high-pressure wash to remove asbestos material from the cathode.  This asbestos material then drained out into the facility's drainage system and ultimately into the Western Ditch.

107.    Although estimates vary, Stauffer has acknowledged discharging large volumes of asbestos into the BMI Ponds.  For example, in a September 24, 1957 Inter-Office Memorandum, Stauffer estimated that the combined Stauffer-Montrose effluent contained 1,000 pounds of asbestos per month.  Stauffer has also reported disposing a total of 1045 tons (or more than 2 million pounds) of asbestos waste to the BMI Ponds through the BMI Complex ditch system between 1946 and 1976.

108.    Effective June 28, 1996, Stauffer executed an agreement with NDEP and other parties acknowledging Stauffer's responsibility for investigation and cleanup of hazardous substances on former Stauffer property where manufacturing and disposal operations occurred. This area includes the upper reaches of the Western Ditch and Northwestern Ditch upgradient of the Sunset Site.  Stauffer continues to perform investigation and cleanup work under this agreement.

109.    Effective February 15, 2006, Stauffer executed an agreement with NDEP and other parties acknowledging Stauffer's liability under CERCLA for cleanup of that portion of the BMI Complex known as the "Common Areas."  The Common Areas includes the lower reaches of the Western Ditch and the Northwestern Ditch downgradient of the Sunset Site.

110.    Effective December 12, 2016, NDEP issued an order to Stauffer requiring characterization of hazardous substances related to the Western Ditch and the Beta Ditch, which connected to the Northwestern Ditch, on former Stauffer property upgradient of the Sunset Site.

**C.    Montrose.**

111.    In 1947, Montrose subleased from Staffer approximately 10 acres of BMI property on which Montrose built an organic chemical manufacturing plant.  Between 1947 and 1983, Montrose produced a variety of organic chemicals at its manufacturing plant, including monochlorobenzene, polychlorinated benzenes, chloral and dichlorobenzil.  In 1954, Montrose

PARSONS
BEHLE &
LATIMER

16

4870-0207-8355

built a synthetic hydrocholoric acid plant on the same property it leased from Stauffer; thereafter it produced industrial grade hydrochloric acid both as a byproduct and at its synthetic hydrochloric acid plant.

112.     Prior to beginning construction of a waste water pond evaporation system in 1973, Montrose disposed of its waste into Stauffer's waste drainage system.  Montrose's wastes were commingled with the wastes from Stauffer's operations and conveyed into the Basic Magnesium Plant's ditch system, including the Western and Northwestern Ditches.

113.     The combined Montrose and Stauffer waste effluents were initially channeled to the Lower Ponds.  Beginning in approximately 1970 and 1971, the combined effluents were diverted from the Lower Points to the Upper Ponds through the Beta Ditch Extension.

114.     In addition to channeling its process waste into Basic Management Plant's ditch system (via Stauffer), Montrose also relied on the ditch system for disposal of spills and storm water runoff.  As with its process waste, spills and storm water runoff travelled first into the Stauffer sewer system and then into the Basic Management Plant ditch system, including the Western and Northwestern Ditches.

115.     Montrose's waste stream included pesticide residues, hydrochloric acid used to wash monochlorobenzene, sulfonated organics and sulfuric acid used to wash polychlorinated benzenes.

116.     Effective June 28, 1996, Montrose executed an agreement with NDEP and other parties acknowledging Montrose's responsibility for investigation and cleanup of hazardous substances on former Montrose property where manufacturing and disposal operations occurred. This includes areas and operations that discharged to the Western Ditch and Northwestern Ditch upgradient of the Sunset Site.  Montrose continues to perform investigation and cleanup work under this agreement.

117.     Effective February 15, 2006, Montrose executed an agreement with NDEP and other parties acknowledging Montrose's liability under CERCLA for cleanup of that portion of the BMI Complex known as the "Common Areas."  The Common Areas includes the lower reaches of the Western Ditch and the Northwestern Ditch downgradient of the Sunset Site.

118.   Effective December 12, 2016, NDEP issued an order to Montrose requiring characterization of hazardous substances related to the Western Ditch and the Beta Ditch, which connected to the Northwestern Ditch, upgradient of the Sunset Site.

**D.   Olin.**

119.   Pioneer purchased the Stauffer Site from Stauffer in 1988.

120.   Pioneer continued to operate the chlor-alkali plant on the Stauffer Site.

121.   Hazardous substances continued to migrate from Olin/Pioneer's property into the ditch system and reach the Sunset Site.

122.   Effective February 15, 2006, Pioneer executed an agreement with NDEP and other parties acknowledging Pioneer liability under CERCLA for cleanup of that portion of the BMI Complex known as the "Common Areas." The Common Areas includes the lower reaches of the Western Ditch and the Northwestern Ditch downgradient of the Sunset Site.

123.   In 2007, Pioneer merged with Olin.

124.   Effective June 28, 1996, Pioneer executed an agreement with NDEP and other parties acknowledging Pioneer's liability for investigation and cleanup of hazardous substances on former Pioneer property where manufacturing and disposal operations occurred. This area includes the upper reaches of the Western Ditch and Northwestern Ditch upgradient of the Sunset Site. Olin continues to perform investigation and cleanup work under this agreement.

125.   Effective December 12, 2016, NDEP issued an order to Olin requiring characterization of hazardous substances related to the Western Ditch and the Beta Ditch, which connected to the Northwestern Ditch, on Olin property upgradient of the Sunset Site.

**E.   NERT.**

126.   WECCO was formed in 1941. American Potash and Chemical Company merged with WECCO in 1955. Kerr-McGee purchased American Potash and Chemical Company in 1967. In 2005, Kerr-McGee became Tronox LLC.

127.   Chlorate (including sodium chlorate filter cake), perchlorate, and boron process wastes and related waste streams from cooling tower blowdown, boiler blowdown, and housekeeping washings were disposed of through the Western and/or Northwestern Ditch by Kerr-

PARSONS
BEHLE &
LATIMER
4870-0207-8355

McGee, predecessors, and tenants between 1945 and 1976.

128.    Effective August 1, 1996, executed an agreement with NDEP acknowledging Tronox's liability for investigation and cleanup of hazardous substances on Tronox property where manufacturing and disposal operations occurred.  This area includes the upper reaches of the Northwestern Ditch and other ditches that connected to the Northwester Ditch upgradient of the Sunset Site.  NERT continues to perform investigation and cleanup work under this agreement.

129.    Effective February 15, 2006, Tronox executed an agreement with NDEP and other parties acknowledging Tronox liability under CERCLA for cleanup of that portion of the BMI Complex known as the "Common Areas."  The Common Areas includes the lower reaches of the Western Ditch and the Northwestern Ditch downgradient of the Sunset Site.

130.    At the time of its bankruptcy Tronox had not completed its obligations to characterize hazardous substances on and migrating from Tronox property where manufacturing and disposal operations occurred, making it impossible to identify for potential bankruptcy claimants to identify potential claims against Tronox related to the Sunset Site or other properties impacted by discharges of hazardous substances to the Western Ditch and/or Northwestern Ditch.

131.    NERT is the successor-in-interest to Tronox and/or Tronox's liabilities with respect to the BMI Complex and hazardous substances that have migrated from the BMI Complex.

**F.    Timet and NL Industries.**

132.    Timet was formed from a joint venture agreement between Allegheny Ludlum Steel Corporation and National Lead Company (now NL Industries) in 1950.

133.    Wastes included leach liquor, caustic waste, and other process wastes. All discharges from the Timet plant were commingled with other BMI facilities waste effluents and conveyed in the Western Ditch and/or Northwestern Ditch to the BMI ponds.

134.    National Lead was the original lessee for Timet's facilities and operations.

135.    Effective June 28, 1996, Timet executed an agreement with NDEP acknowledging Timet's responsibility for investigation and cleanup of hazardous substances on Timet property where manufacturing and disposal operations occurred.  This includes areas and operations that discharged to the Western Ditch and Northwestern Ditch upgradient of the Sunset Site.  Timet

PARSONS
BEHLE &
LATIMER

4870-0207-8355

continues to perform investigation and cleanup work under this agreement.

136.    Effective February 15, 2006, Timet executed an agreement with NDEP and other parties acknowledging Timet's liability under CERCLA for cleanup of that portion of the BMI Complex known as the "Common Areas." The Common Areas includes the lower reaches of the Western Ditch and the Northwestern Ditch downgradient of the Sunset Site.

137.    Effective December 14, 2012, NDEP issued an order to Timet requiring excavation and removal of hazardous substances related to the Northwestern Ditch and the Beta Ditch, which connected to the Northwestern Ditch, upgradient of the Sunset Site.

## V.    The Defendants' Investigation and Cleanup Work of Area Near and Adjacent to the Sunset Site.

138.    Defendants and/or their successors-in-interest have entered into agreements with NDEP, pursuant to which they have agreed to engage in cleanup and investigation work in the areas surrounding the Sunset Site.

139.    The cleanup work of impacted soils has primarily involved excavation of soil containing hazardous substances above designated action levels and disposal of the impacted soil in repositories and/or landfills. The Sunset Site is undergoing the same type of cleanup utilizing the same standards and requirements applied response actions on the BMI Complex.

140.    This cleanup work is based on site assessment and investigation overseen by NDEP that occurred in the late 1990s and early 2000s. On November 2, 2001, NDEP issued a Record of Decision ("ROD") describing the process undertaken for selecting this cleanup work.

141.    Before issuing the ROD, NDEP and several of the Defendants named in this action or their successors to steps to solicit public participation and input. Specifically, the parties to the ROD held a series of public meetings beginning on March 9, 2000 and ending on December 1, 1998. *See* ROD at 9. In addition to these public meetings, a Restoration Advisory Committee ("RAC") was formed and held meetings from October, 1999 through April 2001. The RAC which was comprised of twenty community leaders, provided an alternative means for soliciting community opinion regarding proposed cleanup alternatives.

142.    The public input obtained for addressing the BMI Common Areas by excavating

and landfilling impacted soil – soil impacted by the same hazardous substances from the same sources as the soil on the Sunset Site – is equally applicable for excavation of soil from the Sunset Site according to the same requirements and methods used on the BMI Common Areas.  These cleanup measures are all part of the same response action for purposes of National Contingency Plan ("NCP") compliance.  The Sunset Site response action has been conducted consistent with the NCP.

## VI.     Historic Activities at the Sunset Site.

143.    The Sunset Site has never been used for manufacturing or storage of hazardous chemicals.  The only industrial operations at the site have consisted of sand and gravel excavation.  According to aerial photographs, this sand and gravel mining began in the late 1950s.  Prior to that time, there is no record of the Site being used for any industrial purpose other than the Western Ditch and Northwestern Ditch transiting the Sunset Site.

144.    Aerial photographs show that gravel excavation at the Site peaked in the late 1970s.  Site operations continued in the 1980s but transitioned to backfilling.  By the 1990s the Sunset Site was rough graded to its present-day elevation and contours.

145.    Aerial photographs show the Western and Northwestern Ditches in place and as identifiable features leading into the Sunset Site.

## VII.    Sunset's Purchase of the Sunset Site and Cleanup of Asbestos and Other Contamination.

146.    Sunset acquired the Sunset Site in 2013.

147.    At the request of NDEP, Sunset hired an environmental consulting firm, Broadbent and Associates to develop a work plan to collect and analyze soil samples.  Sampling and other site assessment work occurred in September and October, 2017.

148.    In May 2018, Sunset received a Site Characterization Report that identified asbestos in the vicinity of the Western Ditch.

149.    Sunset cleaned up asbestos and other hazardous substances associated with the Western Ditch and Northwestern Ditch that originated on the BMI Complex, crossed the Sunset Site, and reentered the BMI Complex where they terminated at the Lower Ponds.

1   150.   Sunset conducted the cleanup under NDEP oversight in accordance with a

2   Corrective Action Plan dated November 30, 2018.

3   151.   Sunset conducted the cleanup consistent with the National Contingency Plan

4   ("NCP") and has incurred necessary response costs of $6,039,623.30 as a result of the cleanup

5   work.

6   152.   Sunset's cleanup of the Sunset Site delayed Sunset's ability to develop and/or resell

7   the property.

8   153.   The presence of asbestos and other hazardous substances associated with the

9   Western Ditch and Northwestern Ditch that required the cleanup work Sunset adversely affected

10   the market value of the property.

11   **PLAINTIFFS' CLAIMS FOR RELIEF**

12   **FIRST CLAIM FOR RELIEF**

13   **Recovery of costs pursuant to, 42 U.S.C. §§ 9607(a)(1),**
**9607(a)(4)(B) (CERCLA §§ 107(a)(1), 107(a)(4)(B)), as against each of the Defendants**
14   **as a facility owner and/or operator**

15   154.   Sunset realleges and incorporates by reference all of the allegations contained in the

16   preceding paragraphs as if set forth in full herein.

17   155.   CERCLA section 107(a)(1), 42 U.S.C. § 9607(a)(1), provides in relevant part that:

18   [A]ny person who at the time of disposal of any hazardous substance
     owned or operated any facility at which such hazardous substances
19   were disposed of, . . . shall be liable for—. . . any other necessary
     costs of response incurred by any other person consistent with the
20   national contingency plan. . . .

21   42 U.S.C. §§ 9607(a)(2), 9607(a)(4)(b).

22   156.   CERCLA section 101(29) defines the term "disposal" by reference to Section 1004

23   of the Solid Waste Disposal Act ("SWDA"), 42 U.S.C. § 6903. 42 U.S.C. § 9601(29). The SWDA

24   defines "disposal" as:

25   the discharge, deposit, injection, dumping, spilling, leaking, or
     placing of any solid waste or hazardous waste into or on any land or
26   water so that such solid waste or hazardous waste or any constituent
     thereof may enter the environment or be emitted into the air or
27   discharged into any waters, including ground waters.

28   42 U.S.C. § 6903(3).

157.    CERCLA Section 101(14) defines "hazardous substance" as:

> (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C. § 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 U.S.C. § 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 U.S.C. § 2606]. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601(14).

158.    CERCLA Section 101(20) defines "owner or operator" in relevant part as follows: "in the case of an onshore facility or an offshore facility, any person owning or operating such facility."  42 U.S.C. § 9601(20)(A)(ii).

159.    CERCLA Section 101(18) defines "onshore facility" as: "any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land or nonnavigable waters within the United States."  42 U.S.C. § 9601(18).

160.    CERCLA Section 101(9) defines "facility" as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

161.    Each Defendant either owned (including leasehold interests tantamount to ownership) or operated portions of the facility during a time when disposal of hazardous substances occurred.

PARSONS
BEHLE &
LATIMER

4870-0207-8355

162.    CERCLA Section 101(21) defines "person" as: "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21).

163.    CERCLA Section 101(22) defines "release" in relevant part as: "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant). . . ." 42 U.S.C. § 9601(22).

164.    CERCLA Section 101(8) defines "environment" in relevant part as: "any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States." 42 U.S.C. § 9601(8)(B).

165.    Each Defendant named in this action is a "person" as defined in section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

166.    The BMI Complex and the Sunset Site, collectively and without regard to property or ownership boundaries, is a single "facility" as defined in CERCLA section 101(9), 42 U.S.C. § 9601(9), because "hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located" throughout the BMI Complex and the Sunset Site.  The single "facility" that is comprised of the BMI Complex and Sunset Site is hereinafter referred to as the "BMI/Sunset Facility."

167.    The Defendants or their agents or predecessors-in-interests, directly and indirectly, each owned or operated the BMI/Sunset Facility within the meaning of CERCLA section 107(a)(1), 42 U.S.C. § 9607(a)(1).  Each Defendant or their agents or predecessors-in-interests, directly and indirectly, owned the BMI/Sunset Facility or portions thereof or operated the BMI/Sunset Facility or portions thereof in a manner that resulted in hazardous substances being disposed of at the BMI/Sunset Facility.

168.    The Defendants' release and threatened release of those hazardous substances into the BMI/Sunset Facility have caused and will cause Sunset to incur necessary response costs within

1  the meaning of CERCLA Section 101(25), 42 U.S.C. § 9601(25).

2       169.    Sunset has conducted the cleanup consistent with the National Contingency Plan

3  ("NCP") and has incurred necessary response costs as a result of the cleanup work.

4       170.    Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are jointly

5  and severally liable for response costs incurred and future response costs to be incurred in

6  connection with the BMI/Sunset Facility.

7       171.    Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are liable

8  to Sunset for the response costs incurred and future response costs to be incurred by Sunset in

9  connection with the portion of the BMI/Sunset Facility that is the Sunset Site, and Sunset is entitled

10  to recover from each Defendant for its response costs incurred and future response costs to be

11  incurred with regard to the Sunset Site.

12  **SECOND CLAIM FOR RELIEF**
**Recovery of costs pursuant to, 42 U.S.C. §§ 9607(a)(3),**

13  **9607(a)(4)(B) and 9613 (CERCLA §§ 107(a)(3), 107(a)(4)(B)) as against**
**each of the Defendants as arrangers for the disposal of hazardous substances**

14

15       172.    Sunset realleges and incorporates by reference all of the allegations contained in the

16  preceding paragraphs as if set forth in full herein.

17       173.    CERCLA section 107(a)(3) provides in relevant part:

18      [A]ny person who by contract, agreement, or otherwise arranged for

19      disposal or treatment, or arranged with a transporter for transport for
    disposal or treatment, of hazardous substances owned or possessed

20      by such person, by any other party or entity, at any facility or
    incineration vessel owned or operated by another party or entity and

21      containing such hazardous substances . . . shall be liable for—. . . any
    other necessary costs of response incurred by any other person

22      consistent with the national contingency plan. . . .

23  42 U.S.C. §§ 9607(a)(3), 9607(a)(4)(b).

24       174.    The Defendants or their predecessors-in-interests, directly and indirectly, owned and

25  possessed hazardous substances disposed of at the BMI/Sunset Facility.

26       175.    Defendants are liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3)

27  as, or as successors-in-interest to, persons who by contract, agreement or otherwise, arranged for

28  the disposal or treatment, or arranged with a transporter for transport for disposal or treatment of

hazardous substances owned or possessed by them or by another party or entity, at the BMI/Sunset Facility.

176.     Each Defendant, its agent(s), and/or its predecessors-in-interest caused hazardous waste to be discharged, deposited, or released on or into the BMI/Sunset Facility.  The conduct in which each Defendant or its agent(s) engaged constitutes an arrangement for disposal or treatment or constitutes an arrangement with a transporter for transport for disposal or treatment of hazardous substances.

177.     Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are jointly and severally liable for response costs incurred and future response costs to be incurred in connection with the BMI/Sunset Facility.

178.     Pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Defendants are liable to Sunset for the response costs incurred and future response costs to be incurred by Sunset in connection with the portion of the BMI/Sunset Facility that is the Sunset Site, and Sunset is entitled to recover from each Defendant for its response costs incurred and future response costs to be incurred with regard to the Sunset Site.

### THIRD CLAIM FOR RELIEF
**(Private Nuisance pursuant to Nev. Rev. Stat § 40.140—Private Defendants)**

179.     Sunset realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if set forth in full herein.

180.     Defendants Atlantic Richfield, Stauffer, Montrose, Olin, NERT, Timet, and NL Industries ("Private Defendants") by their or their predecessors'-in-interest activities at the BMI Complex and/or their ownership or their predecessors'-in-interests ownership interests at the BMI Complex, intentionally and unreasonably caused the release of pollutants and the contamination of the Sunset Site.

181.     The contaminants originated from the Private Defendants' property and/or from facilities or manufacturing processes that were under the Private Defendants' actual or effective control.  As used in this paragraph, "Private Defendants' property" includes property owned, leased, managed, or controlled by the Private Defendants or any individual Private Defendant or

by any individual Private Defendant's predecessor-in-interest. As used in this paragraph, "facilities or manufacturing processes that were under the Private Defendants actual or effective control" includes waste discharges directed, caused, or made on behalf of the Private Defendants or the Private Defendants' predecessors-in-interest.

182. The contaminants released onto the Sunset Site were injurious to health and have substantially and unreasonably interfered with the free use and comfortable enjoyment of the Sunset Site.

183. On information and belief, some or all of the Private Defendant or their predecessors-in-interest have ceased and/or do not currently engaging in conduct causes the release of pollutants and contamination on the Sunset Site. Despite this apparent cessation of offending activities by some or all of the Private Defendants, their contamination remains on the Sunset Site and is a continuing nuisance.

184. As a direct and proximate result of the release of contaminants, Sunset is unable to freely use the Sunset Site and has suffered and continues to suffer economic losses.

### FOURTH CLAIM FOR RELIEF
**(Trespass pursuant to Nevada common law—Private Defendants)**

185. Sunset realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if set forth in full herein.

186. Private Defendants or their predecessors-in-interest intentionally and/or negligently caused pollutants and contamination to enter and invade the Sunset Site.

187. Neither Private Defendants nor their predecessors-in-interest sought or obtained Sunset's consent or the consent of Sunset's predecessors-in-interest to cause contamination to enter and remain on the Sunset Site.

188. As a direct and proximate result of the Private Defendants' actions, damage has occurred to the Sunset Site and Sunset has suffered and continues to suffer economic losses.

/ / /

/ / /

/ / /

**FIFTH CLAIM FOR RELIEF**
**(Strict liability for abnormally dangerous activities pursuant to**
**Nevada common law—Private Defendants)**

189.     Sunset realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if set forth in full herein.

190.     Private Defendants or their predecessors-in-interest have engaged in activities near and on the Sunset Site that were abnormally, intrinsically, and inherently dangerous and represented a high degree of risk of harm and physical damage to person and real property.   The Private Defendants conduct, described more fully in the preceding paragraphs, included but was not limited to manufacturing and industrial activities that involved hazardous waste byproducts released onto land and ditches.

191.     This activity caused widespread contamination in and surrounding the BMI Complex.   The Private Defendants or their predecessors-in-interest have acknowledged and attempted to account for some, but not all, of the harm caused by their conduct by entering into certain administrative agreements with NDEP.   These agreements have required that the Private Defendants pay for cleanup of contamination resulting from their abnormally dangerous activities. These agreements, however, have not addressed contamination at the Sunset Site.

192.     The risks posed by the Private Defendants' conduct (or the conduct of their predecessors-in-interest) could not be eliminated with the exercise of reasonable care.   There is no safe way to release toxic waste and contaminated effluent into open air drainage ditches.

193.     The Private Defendants' release of toxic and contaminated substances was neither a matter of common usage nor appropriate to the place where it was carried out.

194.     The value of the Private Defendant's conduct is far outweighed by the serious environmental harms and property damage caused by them.   On information and belief, the Private Defendants or their predecessors-in-interest were engaged in commercial enterprises and manufacturing product for a profit.   Whatever the importance that may be assigned to their commercial and profitability interests, that importance is far outweighed by the need to care for the environment and cleanup of property.

195.     As a direct and proximate result of the Private Defendants' abnormally, intrinsically,

PARSONS
BEHLE &
LATIMER

28

4870-0207-8355

and inherently dangerous activities, Sunset has suffered and continues to suffer economic losses. The Private Defendants are strictly liable for these losses.

**SIXTH CLAIM FOR RELIEF**
**(Negligence pursuant to Nevada common law—as to Private Defendants)**

196.    Sunset realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if set forth in full herein.

197.    The Private Defendants or their predecessors-in-interest owed a duty of care to Sunset and prior owners of the Sunset Site to responsibly own, operate, respond to spills and releases, and take all measures reasonably necessary to protect the public, including Sunset, from contamination of property.

198.    The Private Defendants, including its officers, agents, employees and/or predecessors-in-interests knew, or in the exercise of reasonable care should have known, that their activities would result in the release of hazardous substances.

199.    The Private Defendants, including their officers, agents, employees and/or predecessors-in-interests knew, or in the exercise of reasonable care should have known of the dangerous, offensive, hazardous, or toxic nature of their operations and activities near the Sunset Site.

200.    The Private Defendants, including their officers, agents, employees and/or predecessors-in-interest knew, or in the exercise of reasonable care should have known of the dangerous, offensive, hazardous, or toxic nature of their releases near the Sunset site and that those releases were capable of contaminating the soil of downgradient property owners.

201.    The Private Defendants, including their officers, agents, employees and/or predecessors-in-interest, failed to take reasonable precautions and measures to prevent or mitigate the releases and spills, as well as adequate planning for spills, overflows, and other emergencies.

202.    The spills and releases caused by the Private Defendants' negligent conduct and the resulting harm to the Sunset Site were foreseeable consequences of the Private Defendants acts and/or omissions.

203.    The Private Defendants' negligent actions or omissions are the direct and proximate

cause of damage to Sunset.

204.   Sunset in no way contributed to the damages and injuries it has sustained.

205.   The Private Defendants, by reason of their negligence, are liable for all of the damages and injuries to Sunset proximately caused by the spills and releases described herein.

## PRAYER FOR RELIEF

WHEREFORE, Sunset prays for the following relief:

1.   Judgment for fair and reasonable damages against all Defendants for response costs in accordance with CERCLA Sections 107(a);

2.   A declaration on liability and response costs or damages in accordance with CERCLA Sections 107(a) and 113(g)(2);

3.   Judgment for fair and reasonable damages against the Private Defendants pursuant to Sunset's Nevada law claims (private nuisance, trespass, strict liability for abnormally dangerous activities, and negligence); and

4.   Any other relief deemed just and appropriate by this Court.

## DEMAND FOR JURY TRIAL

Sunset hereby demands a trial by jury on all issues so triable.

DATED: December 14, 2023                    PARSONS BEHLE & LATIMER

By:   _/s/ Ashley C. Nikkel_
Richard J. Angell, Nevada Bar No. 9339
Ashley C. Nikkel, Nevada Bar No. 12838
50 West Liberty Street, Suite 750
Reno, NV 89501
Telephone:  775.323.1601
Facsimile:  775.348.7250
rangell@parsonsbehle.com
anikkel@parsonsbehle.com

*Attorneys for Sunset Commercial LLC*

1

## INDEX OF EXHIBITS

2

| Exhibit | Description | Pages |
|---------|-------------|-------|
| 1 | Figure detailing the location of the Sunset Site and the BMI Complex | 1 |
| 2 | Figure depicting the various ditches of the BMI Complex | 1 |
| 3 | Conceptual diagram illustrating the roles the Western and Northwest Ditch played in conveying discharges of hazardous substances from industrial operations to the disposal locations | 1 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARSONS
BEHLE &
LATIMER

4870-0207-8355

31